## IN THE COURT OF COMMON PLEAS OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | Cr. ID No. 1307021869 |
| | ) | |
| MATTHEW J. MOON, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: July 9, 2014
Decided: July 9, 2014

Christina Kontis, Esquire
Deputy Attorney General
820 N. French Street, 8TH Floor
Wilmington, DE 19801
*Attorney for the State of Delaware*

Louis B. Ferrara, Esquire
1716 Wawaset Street
Wilmington, DE 19806
*Attorney for Defendant*

## DECISION AFTER TRIAL

Defendant Matthew J. Moon ("Moon") was arrested on July 27, 2013 during a stop at a sobriety checkpoint (the "Checkpoint") and charged with Driving Under the Influence ("DUI") in violation of 21 *Del. C.* § 4177. On January 1, 2014, Moon filed the present Motion to Suppress, challenging the Checkpoint and subsequent arrest.

A hearing on the Motion was held on June 2, 2014 and June 5, 2014. At the hearing, the Court heard testimony from three witnesses: Lieutenant Michael Wysock, Officer William Haggerty, and Defendant Matthew Moon. Also, documents were received into evidence.[1] At the conclusion of the hearing, the Court reserved decision and the matter proceeded to trial.

At trial, the Court heard testimony from Officer Haggerty. At the conclusion of the trial, the Court reserved decision. This is the Court's Final Decision and Order.

---

[1] State's Exhibits 1–10 were received into evidence.

## I.     DEFENDANT'S MOTION TO SUPPRESS

It is Moon's position that the State failed to prove that the Checkpoint was created and operated pursuant to established policy guidelines. Thus, Moon contends, the initial detention of Moon was not based upon reasonable articulable suspicion and the "seizure" of Moon was in violation of the Fourth Amendment of the United States Constitution. Specifically, Moon argues that the testimony regarding the selection of the Checkpoint location is inadmissible under D.R.E. 902(11) because he did not receive adequate notice of the evidence the State intended to offer. Absent such testimony, Moon concludes, there is insufficient evidence to show that the seizure at the Checkpoint was reasonable under the Fourth Amendment.

The State counters that Rule 902(11) does not apply because the officer involved in the selection of the Checkpoint location, Lieutenant Wysock, was present at the hearing and offered testimony as to the selection of the location procedure. The State maintains that it must satisfy Rule 902(11) only where the testifying officer is not familiar with the checkpoint selection.

### FACTS PRESENTED AT THE SUPPRESSION HEARING

At the suppression hearing, the Court heard testimony from Lieutenant Wysock, Officer Haggerty, and Moon. Based on the testimony presented, the Court finds the following:

On July 18, 2013, Lieutenant Wysock sent a checkpoint request to Captain Sherri Benson, seeking to conduct a sobriety checkpoint on July 26, 2013, in a specific "grid." The requested checkpoint was approved for July 26, 2013, from 10:00 p.m. to 2:00 a.m. at a location within the specified grid on U.S. Route 40 at Wilton Boulevard (hereinafter, the "Checkpoint"). Lieutenant Wysock had selected this location based on a report compiled by the State statistician, Tammy Hyland. The electronically generated report was based on ticket and crash data

2

compiled from 2009 through 2012. The report identified grid locations that satisfied the Delaware State Police ("DSP") guidelines.

On July 26, 2013, the Checkpoint was executed at the approved location. The participating officers met at 9:00 p.m. at the Newport Police Department, whereupon each of the approximately 31 officers was instructed on the procedure to be used during the execution of the Checkpoint.

The Checkpoint was run on both the eastbound and westbound lanes. Signs were posted to notify motorists of the impending stop; first, a sign warned motorists to be prepared to stop, followed by a rumble strip, and then a stop sign. A police officer was stationed at the base of the Checkpoint. The Checkpoint area was illuminated by lights, and it was marked by cones topped with blinking lights. The officers operating the Checkpoint wore reflective vests.

Officer Haggerty was assigned to the eastbound lane of the Checkpoint when he observed a vehicle travel into the Checkpoint at a high rate of speed. The vehicle did not stop at the initial stop sign, and continued through the Checkpoint. As another officer yelled for the vehicle to stop, Officer Haggerty attempted to stop the driver by shining his flashlight into the vehicle. The vehicle came to a screeching halt and veered to the left as it did so.

Officer Haggerty instructed the driver, whom he identified as Moon, to pull out of the lane, which he did without issue. Officer Haggarty identified himself and informed Moon why he was being stopped. He observed that Moon's eyes were bloodshot and glassy, and he noted a strong odor of alcohol. Moon stated that he had consumed two or three shots of whisky but did not specify at what time he did so. Moon also stated that he did not drink enough to put anyone in harm's way, and explained "I'm Asian so my body doesn't tolerate a lot of alcohol, I guess."

3

Officer Haggerty asked Moon to perform a counting test and an alphabet test, both of which Moon performed unsatisfactorily. For the alphabet test, Moon was instructed to recite the alphabet from the letter 'E' to the letter 'P.' Moon skipped five letters in his attempt.[2] For the counting test, Moon was instructed to count backwards from 81 to 66. Moon correctly counted backwards from 81 to 70, and then recited the following: "60, 70, 69, 67, 66."

Next, Officer Haggarty directed Moon to exit the vehicle and had him stand on a smooth, flat surface to conduct field sobriety tests. Moon stumbled to the left as he exited the vehicle. Officer Haggarty noted that Moon's speech was "fair" and that he was cooperative. Officer Haggerty conducted three field sobriety tests: the Horizontal Gaze Nystagmus ("HGN") test,[3] the Walk-and-Turn Test, and the One-Leg Stand Test.[4]

On the Walk-and-Turn test, Moon exhibited five of eight possible clues. Specifically, Moon took twice as many steps as instructed; he did a complete turn; he fell off to his right side; and, he missed heel-to-toe steps more than one-half of an inch. Officer Haggerty testified that, with the presence of two clues, there is a 68% probability of a blood alcohol concentration ("BAC") at .10 or above.

Next, Officer Haggerty gave Moon the instructions for the One-Leg Stand Test, and Moon affirmed that he understood the directions. However, instead of performing the described test, Moon began repeating the Walk-and-Turn Test. When Moon finally performed the correct One-Leg Stand Test, he exhibited two clues. Specifically, Moon bent his knee and extended his

---

[2] Moon recited the letters E, F, and G, then paused and proceeded with L, M, N, O, P, Q, S, T.
[3] At trial, the State conceded that Officer Haggerty wrote in his report that he observed resting nystagmus, thus the HGN test was not admissible.
[4] Moon also submitted to a PBT; however, the State concedes that the results of the PBT should not be admitted for failure to adhere to NHTSA guidelines.

arms up over six inches. Officer Haggerty testified that, with the presence of two clues, there is a 65% probability of a BAC at .10 or above.

After completing the field sobriety tests, Officer Haggerty determined that Moon was too impaired to drive and moved him to the intoxilyzer station.

## DISCUSSION

On a motion to suppress, the State must prove by a preponderance of the evidence that a warrantless search was not in violation of the Fourth Amendment.[5] Citizens of this State are protected from unreasonable searches and seizures under both the Fourth Amendment of the United States Constitution and Article I, Section 6 of the Delaware Constitution.[6] Even a temporary detention during an automobile stop by police constitutes a "seizure" within the meaning of the Fourth Amendment.[7]

Delaware courts have found sobriety checkpoints to be "reasonable" seizures when procedures are in place "to ensure that cars passing through checkpoints are stopped in a reasonably safe manner and . . . sufficient safeguards are in place limiting the discretion of law enforcement officers with respect to the location of each checkpoint and the stopping of vehicles."[8] The Delaware State Police policy guidelines establish selection and operation criteria for sobriety checkpoints.[9] These policy guidelines "act as a substitute for the reasonable requirements of the Fourth Amendment."[10]

---

[5] *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001).
[6] *Moore v. State*, 997 A.2d 656, 663 (Del. 2010).
[7] *Whren v. United States*, 517 U.S. 806, 809-810 (1996).
[8] *Id.*
[9] *Terry*, 2013 WL 3833085, at *3 (citation omitted).
[10] *Id.*

5

### a. The State did not rely on D.R.E. 902(11)

Moon argues that the State failed to give requisite notice for the admission of data underlying the selection of the Checkpoint location under D.R.E. 902(11) (the "Statistical Data"). In support of his position, Moon relies on *State v. Terry*.[11] In *Terry*, the Court granted the defendant's motion to suppress because of the State's failure to satisfy D.R.E. 902(11):

> "D.R.E. 902(11)(C) places the burden of notification of intent to use written declarations and to provide adequate information regarding the purported business records on the proffering party – here, the State. The State did not do this and, thus, prevented Mr. Terry from fair opportunity to challenge the 902(11) Declaration."[12]

Moon's reliance on *Terry* is misplaced, as the State does not seek to admit the Statistical Data through a certified record under D.R.E. 902(11).[13] Rather, the State seeks to admit the Statistical Data as a business record under D.R.E. 803(6) through the testimony of a qualified witness, Lieutenant Wysock.

A document is admissible under the business records exception to the hearsay rule, D.R.E. 803(6) even in the absence of testimony from the person who made the record, where the record: (1) was prepared in the regular course of business; (2) was made at or near the time of the event; (3) the information and circumstances of its preparation are trustworthy; and (4) a custodian or other qualified witness is available to testify.[14]

---

[11] *State v. Terry*, 2013 WL 3833085 (Del. Super. Jul. 18, 2013).

[12] *Id.*

[13] This case differs from *Terry* in that Moon was in possession of the raw data upon which the Checkpoint was selected. In *Terry*, the defendant specifically requested the raw traffic data. The State failed to produce the requested data and did not present a competent witness to testify to the data at the suppression hearing. The court noted that the State's failure to provide the data coupled with the lack of witness testimony "frustrated" existing issues concerning the reliability of the State's 902(11) Self Authenticating Declaration. *See id.*

[14] *Talley v. State*, 841 A.2d 308, TABLE at *2 (Del. 2003).

To testify as an "other qualified witness," the attestant must be familiar with the record-keeping system and testify to the following foundational requirements:

> (1) [that] the declarant in the records had knowledge to make accurate statements; (2) that the declarant recorded statements contemporaneously with the actions which were the subject of the reports; (3) that the declarant made the record in the regular course of business activity; and (4) that such records were regularly kept by the business.[15]

Lieutenant Wysock's testimony satisfies the D.R.E. 803(6) requirements of an "other qualified witness." Lieutenant Wysock testified that he is familiar with the record-keeping system and the method by which the Statistical Data is generated. His testimony demonstrated that the record was prepared in the regular course of business by the State statistician and that the reports were made on an annual basis contemporaneous to the data collection process. There is nothing in the record to cast doubt on the trustworthiness of the information and circumstances surrounding the creation of the report.[16] "There is a well established presumption that, in the absence of evidence to the contrary, those responsible for certain services to the public will carry out their duties in a proper, careful, and prudent manner."[17]

It is well-settled that the Court may rely on hearsay evidence at a suppression hearing, regardless of its admissibility at trial.[18] There are indicia of reliability of the Statistical Data because Lieutenant Wysock testified that he oversaw the document's creation process, and the Court will afford it the appropriate weight.

**b. The Checkpoint was Established Pursuant to a Pre-existing Plan**

---

[15] *Trawick v. State*, 845 A.2d 505, 508 (Del. 2004).

[16] This case is further distinguishable from *Terry* because there is no ambiguity or other discrepancy casting doubt as to the reliability of the underlying data. In *Terry*, the "purported 'statistical information' relating to the Checkpoint [was] ambiguous as to whether the Checkpoint [was] an area with a 'demonstrated problem' . . . No one at the Hearing . . . could satisfactorily reconcile the statistics." *Terry*, 2013 WL 3833085, at *5.

[17] Judah v. State, 234 A.2d 910, 911 (Del.1967).

[18] *State v. Brown*, 2010 WL 2878246, at *2 (Del. Super. July 22, 2010).

7

Lieutenant Wysock testified that the Checkpoint was conducted pursuant to DSP procedures, which requires reliance on a grid system. Lieutenant Wysock explained that the report created by the State statistician looks at arrest and accident data. Lieutenant Wysock compares this report with a list of desired checkpoint locations and determines which locations qualify under DSP guidelines, which call for at least three alcohol-related crashes or at least nine DUI arrests in any of the prior three years.[19] Based on the data, Lieutenant Wysock submitted a request for the Checkpoint to Captain Sherri Benson, Director of Traffic. Captain Benson approved the Checkpoint on July 18, 2013.

The testimony presented and documents submitted into evidence by the State support the position that the Checkpoint was created pursuant to a pre-existing plan in accordance with DSP Guidelines. Accordingly, the Court finds that the State has met its burden of proving by a preponderance of the evidence that the seizure of Moon at the Checkpoint was "reasonable" under the Fourth Amendment. Accordingly, Moon's Motion to Suppress is **DENIED**.

## II.  TRIAL

Following the suppression hearing, the case proceeded to trial. The State sought to admit the intoxilyzer results into evidence through the testimony of Officer Haggerty. However, the testimony of Officer Haggerty was insufficient to establish the requisite foundation for the admission of the intoxilyzer results, and the State instead proceeded on an impairment theory.

It is the State's position that the evidence presented is sufficient to find Moon guilty of DUI. Even in the absence of the intoxilyzer results, the State asserts that it met its burden of proof by showing beyond a reasonable doubt that Moon drove the motor vehicle while under the influence of alcohol.

---

[19] State's Exhibit 3.

8

It is Moon's position that the evidence presented does not establish impairment beyond a reasonable doubt. Moon argues that he failed to stop at the onset of the Checkpoint because he was under the reasonable belief that he was approaching a construction zone. Moon attributes his performance on the alphabet and counting tests to his Korean upbringing, and likewise credits his poor performance on the field tests to nervousness and miscommunication resulting from his Korean background. Moon also emphasizes that he did not have slurred speech.

## DISCUSSION

21 *Del. C.* § 4177(a)(1) provides that "[n]o person shall drive a vehicle . . . when the person is under the influence of alcohol." To find a defendant guilty of DUI under this provision, the State must prove beyond a reasonable doubt that (1) the defendant drove a motor vehicle at or about the time and place charged, and (2) the defendant was under the influence of alcohol while he drove the motor vehicle.[20]

To prove impairment, chemical testing is not required,[21] and the State is not required to demonstrate that the driver was "drunk" or "intoxicated."[22] Rather, the State need only establish that the defendant's ability to drive safely was impaired.[23] "The evidence must show that the person has consumed a sufficient amount of alcohol to cause the driver to be less able to exercise the judgment and control that a reasonably careful person in full possession of his or her faculties would exercise under like circumstances."[24]

---

[20] *Bennefield v. State*, 2006 WL 258306, at \*3 (Del. Super. Jan. 4, 2006).
[21] *Id.*
[22] *Lewis v. State*, 626 A.2d 1350, 1355 (Del. 1993).
[23] *Lewis v. State*, 626 A.2d 1350, 1355 (Del. 1993).
[24] *Id.*

It is uncontested that Moon drove a motor vehicle at or about the time and place charged. The remaining issue for determination is whether Moon was under the influence of alcohol when he drove the motor vehicle. The State has proven beyond a reasonable doubt that he was.

The State presented a plethora of factors demonstrating impairment, specifically: Moon's behavior in approaching – and nearly driving through – the Checkpoint; his physical manifestations, including glassy bloodshot eyes and a strong odor of alcohol; his admission to consuming two or three shots of whisky; his significant issues with the alphabet and counting tests; his stumbling upon exiting the vehicle; and, his unsatisfactory performance on the Walk-and-Turn and One-Leg Stand Tests.

Moon argues that his initial failure to stop at the Checkpoint was due to his belief that he was merely approaching a construction zone. Moon testified that the Checkpoint was in an area that was frequently under construction, and as he approached the scene he decreased his speed accordingly. However, the testimony presented by both Lieutenant Wysock and Officer Haggerty confirms that there was sufficient notice to motorists of the impending Checkpoint. First, a sign warned motorists to slow down, followed by a rumble strip and finally a stop sign. The area was lit and coned, and the roughly 31 officers present wore reflective vests. The Court finds this testimony credible to determine that the existence of a DUI checkpoint was readily apparent.

Moon also argues that his performance on the memory tests was due to his Korean upbringing. Moon grew up in his native South Korea, and did not move to the United States until he was sixteen or seventeen years old. Moon maintains that the alphabet test is irrelevant because he never learned the English alphabet. Moon also suggests that, despite the limitations of his non-English education, his performance on the counting test was reasonable. The Court

10

finds this argument to be unsupported. Moon has been living in the United States for nearly 15 years, and he testified that he is currently a resident in radiology at Christiana Care. In light of his advanced education and profession, the Court does not afford this argument much weight.

The Court rejects Moon's contention that his performance on the field sobriety tests was the result of miscommunication. Officer Haggerty testified that he confirmed Moon understood the directions at each juncture of the field sobriety tests. Again, the extent of Moon's education and professional accomplishments suggest an ability to understand and follow directions.

## CONCLUSION

For the foregoing reasons, the Court finds that the State has met its burden of proving beyond a reasonable doubt that Moon operated a vehicle while under the influence. Based on the evidence in the record, I find Defendant guilty of driving under the influence in violation of 21 *Del. C.* § 4177. This Judicial Officer shall retain jurisdiction of this case and shall schedule it forthwith for sentencing.

**IT IS SO ORDERED.**

_____
Robert H. Surles,
Judge

11